# UNITED STATES DISTRICT COURT

_____ DISTRICT OF MASSACHUSETTS _____

UNITED STATES OF AMERICA

    v.

EDDY LOPEZ,
    A/K/A "SWIFT"

(Name and Address of Defendants)

## CRIMINAL COMPLAINT

M.J. No. _2004m cy44RBC_

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about __December 15 and December 17, 2003__ in __Essex__ County, in the District of __Massachusetts__ and elsewhere defendants did,

**AFTER HAVING BEEN CONVICTED IN A COURT OF A CRIME PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR, KNOWINGLY POSSESS IN AND AFFECTING COMMERCE, A FIREARM, TO WIT: A SMITH AND WESSON NINE MILLIMETER HANDGUN, BEARING SERIAL NUMBER A412638,**

**KNOWINGLY AND INTENTIONALLY POSSESS WITH INTENT TO DISTRIBUTE AND DISTRIBUTE HEROIN, A SCHEDULE I CONTROLLED SUBSTANCE, AND**

**KNOWINGLY AND INTENTIONALLY POSSESS WITH INTENT TO DISTRIBUTE AND DISTRIBUTE COCAINE, A SCHEDULE II CONTROLLED SUBSTANCE,**

in violation of Title __21__ United States Code, Section __841(a)(1)__ and Title __18__ United States Code, Section __922(g)(1)__ .

I further state that I am a **Special Agent with the Federal Bureau of Investigation** and that this complaint is based on the following facts:

**See attached Affidavit of Jeffrey E. Wood, Jr.**

Continued on the attached sheet and made a part hereof: **X** Yes ☐ No

                         Signature of Affiant
                         **JEFFREY E. WOOD, JR.**
                         **Special Agent - FBI**

Sworn to before me and subscribed in my presence,

__January 19, 2004__ _at 1:14 pm_ at    __Boston, Massachusetts__
Date                                    City and State

                                     Signature of Judicial Officer

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT OF JEFFREY E. WOOD, JR.

I, Jeffrey E. Wood, Jr., being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI for more than four years. I am currently assigned to the Violent Crime Task Force ("VCTF") investigating, among other things, drug and drug-related crimes in the Lawrence, Massachusetts area.

2. During my four plus years with the FBI, I have been involved in numerous investigations relating to a wide variety of suspected criminal activity including drug and firearms trafficking, bank robberies, armored car robberies, and kidnaping. I have received training in the field of narcotics enforcement and investigations including, but not limited to, training regarding the identification of common street drugs such as cocaine and heroin. Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3. I am submitting this affidavit for two reasons. The first is in support of an application for a criminal complaint charging that, on or about December 15, 2003, EDDY LOPEZ, A/K/A "SWIFT", after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting commerce, a firearm, to wit:
a Smith and Wesson nine millimeter handgun, bearing serial number
A412638, in violation of 18 U.S.C. §922(g)(1), and charging EDDY
LOPEZ, A/K/A "SWIFT", with one count of possession with intent to
distribute and distribution of heroin, a Schedule I controlled
substance, on or about December 15, 2003, and one count of
possession with intent to distribute and distribution of cocaine,
a Schedule II substance, on or about December 17, 2003, in
violation of 21 U.S.C. §841(a)(1). As is explained more fully
below, LOPEZ, who had previously been convicted in Massachusetts
of operating to end lives, a crime punishable by imprisonment for
a term exceeding one year, made a controlled sale of a Smith and
Wesson nine millimeter handgun and a controlled sale of heroin to
a cooperating witness working with the FBI (the "CW") on December
15, 2003, and also made a controlled sale of cocaine to the CW on
December 17, 2003. The three sales were surveilled by law
enforcement officers and consensually recorded.

4.   I am also submitting this affidavit in support of an
application for the issuance of a search warrant authorizing the
search of a residence located at 594 Haverhill Street, First
Floor, Lawrence, MA, (hereinafter "the Target Premises," more
fully described below). As described more fully below, the
Target Premises is the residence of LOPEZ and his mother, NEIDA
TORRES, A/K/A, NEIDA LOPEZ, and is the location where LOPEZ sold

2

the CW the heroin on December 15, 2003, is where the CW gave
LOPEZ the money for the heroin, and is also where LOPEZ showed
the CW several ounces of cocaine on December 15, 2003.  I submit
that there is probable cause to believe that evidence of
violations of the federal drugs laws, including 21 U.S.C.
841(a)(1), exists in the Target Premises, including, but not
limited to, heroin, cocaine, drug packaging materials and other
paraphernalia, U.S. currency obtained as the result of drug
sales, documents and other records detailing the purchases of
heroin, cocaine, or other drugs, and telephones or communication
devices used to facilitate the distribution of narcotics.
Because LOPEZ sold a firearm in this case, repeatedly talked
about selling and buying other guns, and has a history of violent
crime.

        5.   This affidavit is submitted for the limited purpose of
establishing probable cause to believe that LOPEZ has committed
the above-described offenses and that there is probable cause to
believe that evidence of those offenses is located in the Target
Premises.  Accordingly, I have not included each and every fact
known to myself and other law enforcement officers involved in
this investigation.  As a result of my personal participation in
the investigation, interviews with and analysis of reports
submitted by other law enforcement personnel, interviews of
confidential sources, and my consultations with other law

                                3

enforcement officers, I am familiar with this investigation.

    6.  The Target Premises is described as follows:

594 Haverhill Street, Lawrence, MA, is the right side
of two, multi-family residences located at the corner
of Haverhill and Ames Streets.  There are two, white
front doors on the porch at the front of the building.
The number "594" is in the center of the door to the
right (if facing the building), which is the doorway to
594 Haverhill Street, First Floor, which is occupied by
EDDY LOPEZ and his mother, NEIDA TORRES, A/K/A/ NEIDA
LOPEZ.  The number "592" is in the center of the door
to the left (if facing the building).  594 Haverhill
Street is described as a three story wooden structure
with a white wooden porch at the front with mailboxes
between the two doors on the porch of the building.
594 Haverhill Street, First Floor, is a floor through
apartment that runs from the front to the back of the
first floor of 594 Haverhill Street.  There is a side
door entrance to 594 Haverhill Street, First Floor, on
the right side of the building which fronts Ames
Street.  There is a bush next to the side entrance
which obscures its visibility from Haverhill Street.

Two photographs of the Target Premises are attached to this

affidavit as Exhibit A.

## INITIATION OF THE INVESTIGATION

    7.  For the past six months, I have been the case agent on a

multi-agency investigation of the Dome Dwellers, a violent street

gang operating in Lawrence, Massachusetts.  Since the beginning

of the investigation, law enforcement agents have made numerous

purchases of controlled substances and firearms from members and

associates of the Dome Dwellers using confidential informants and

cooperating witnesses.

    8.  The investigation of the Dome Dwellers was initiated in

4

the Summer of 2003, based on information from law enforcement and confidential sources concerning drug trafficking by the Dome Dwellers in and around the area of the Essex Street Projects in Lawrence, Massachusetts.  Law enforcement and confidential sources identified EDDY LOPEZ, A/K/A "SWIFT", as the leader of the Dome Dwellers, and indicated that he was known to carry a firearm.  Law enforcement and confidential sources also indicated that an individual named VICTOR DELGADO, A/K/A "BITIN", was a close associate of LOPEZ and that DELGADO was also known to carry a firearm.

9.  In late Fall 2003, under my instruction and supervision, a cooperating witness working with the FBI (the "CW") had several conversations with EDDY LOPEZ, A/K/A "SWIFT", many of which were consensually recorded, in which they talked about LOPEZ selling the CW a gun and drugs.[1]  For example, on November 25, 2003, LOPEZ and the CW had a consensually recorded meeting at 30 May Street, Apt. C, Lawrence, MA, the home of VICTOR DELGADO, A/K/A "BITIN", a close associate of LOPEZ.  During that meeting, LOPEZ offered to sell the CW a MAC 10 (a semi-automatic handgun that is similar in appearance to an UZI) for $800.[2]  In addition, on

---

[1] The CW is a convicted drug trafficker with a significant criminal record and has been paid by the government for his/her assistance in this investigation.

[2] LOPEZ said that his cousin had the gun and called his cousin who said that he had already sold the MAC 10.

5

November 17, 2003, during a controlled buy of heroin from VICTOR DELGADO, A/K/A "BITIN", at 30 May Street, Apt. C, in Lawrence, LOPEZ showed the CW a small black semi-automatic pistol that LOPEZ had on his person.

10.  I and other law enforcement officers employed certain procedures throughout this investigation.  Prior to all of the buys, I and/or other law enforcement officials searched the CW and the car he/she would be driving to ensure that the CW had no controlled substances or cash on him/her.  Upon completing the search, the CW was given a recording device, a transmitter, a set amount of official government funds ("OGF"), and a car equipped with audio/video surveillance equipment.  All of the buys and many of the conversations leading up to them have been consensually recorded on audio and/or videotape.

### THE PURCHASE OF A NINE MILLIMETER HANDGUN AND TWO "FINGERS" OF HEROIN ON DECEMBER 15, 2003

11.  On the morning of December 15, 2003, I met with the CW and the CW told me that LOPEZ had called the CW the previous night and told the CW that LOPEZ had a nine millimeter handgun to sell the CW and also agreed to sell the CW twenty grams of heroin.  The CW said they agreed that LOPEZ would be at DELGADO's house -- 30 May Street, Apt. C, in Lawrence -- the following morning if the CW wanted to buy the gun and heroin.

12.  On the morning of December 15, 2003, at my direction, the CW attempted unsuccessfully to call LOPEZ at 978-397-2180,

6

the cellular telephone number that LOPEZ had previously given the CW. I then told the CW to go to 30 May Street (where surveillance agents had set up) to meet with LOPEZ. Under surveillance and while wearing a recoding device, the CW drove to 30 May Street and met with "CHINA" (subsequently identified as MARISOL ROQUE), the girlfriend of DELGADO. ROQUE told the CW that LOPEZ had left and that DELGADO was sleeping. The CW left the apartment and was followed by agents to a pre-determined meeting place. I then told the CW to return to his/her home and wait for LOPEZ to contact him/her.

13. At approximately 1:30 p.m. on December 15, 2003, I again met with the CW. The CW told me that LOPEZ had called the CW and that LOPEZ had told the CW that he still had the nine millimeter handgun, which he would sell to the CW for $950. At approximately 2:31 p.m., in my presence, the CW got an incoming call from LOPEZ, which was not recorded. After speaking with LOPEZ, the CW told me that LOPEZ had told the CW to drive to the corner of Haverhill and Ames Streets in Lawrence, MA.

14. Shortly thereafter, law enforcement officers set up surveillance near the corner of Haverhill and Ames Streets in Lawrence. I then told the CW, who was wearing a recording device, to go to the corner of Haverhill and Ames Streets to meet with LOPEZ. Surveillance agents then saw the CW arrive at the corner of Haverhill and Ames Streets. LOPEZ signaled to the CW

7

from a window of a house on the corner of Haverhill and Ames
Streets and then came out and got into the car.  I subsequently
drove by this location with the CW and he/she identified the
house from which EDDY LOPEZ came, which was 594 Haverhill Street
(i.e., the Target Premises).  On December 15, 2003, I was
monitoring the transmitting device worn by the CW and, at about
2:46 p.m., I overheard LOPEZ get into the CW's car.

15.  Agents surveilled the CW and LOPEZ to 30 May Street
(i.e., DELGADO's residence).  I have reviewed the videotape of
the car ride and compared the image of the person with the CW to
a photograph of LOPEZ obtained from the Registry of Motor
Vehicles.  I recognize LOPEZ as the person in the video.  On the
videotape, LOPEZ can be seen and heard saying that he has a Smith
and Wesson nine millimeter to sell the CW.  LOPEZ also stated
that he has fired the gun, that he has bullets for the gun for
the CW, and that he will sell the CW the heroin for $850 per ten
gram.

16.  When they got to 30 May Street, I saw LOPEZ and the CW
get out of the CW's car and walk to a van in the parking lot by
30 May Street.  I overheard LOPEZ and the CW exit the vehicle and
enter LOPEZ's van.  When the CW and LOPEZ got to the van, LOPEZ
lifted up the floor mat, revealing the Smith and Wesson nine
millimeter.  I have reviewed the audiotape of the December 15,
2003 meeting between LOPEZ and the CW in the van, and compared

8

the voices on it with LOPEZ's voice on the videotape of the December 15, 2003 meeting between LOPEZ and the CW in the CW's car, and recognize the voice of LOPEZ talking with the CW on the audiotape.

17.   On the December 15 audiotape, LOPEZ and the CW can be heard in the van, in English, praising the looks of the gun and then LOPEZ can be heard stating that it "goes off like a motherfucker . . . boom, boom, boom, boom . . ."  The CW can then be heard asking LOPEZ if he had gotten an extra clip for the CW; LOPEZ can be heard saying no "but I'll get you another clip nigger."  LOPEZ also explains that the "Feds" are on him because he sold a "burner" (a firearm) to someone in Manchester who had later been arrested and LOPEZ was concerned the individual had snitched on him.

18.   The CW and LOPEZ then discussed the heroin and LOPEZ said it would cost $850 for ten grams and that he would call his "connect" right now.  LOPEZ talked more about his gun business and he handed the gun to the CW.  The CW gave LOPEZ $800 in OGF in exchange and told LOPEZ that he/she would give LOPEZ the additional $150 at a later time.  They agreed that the CW would call LOPEZ later to do the heroin deal.  I observed both the CW and LOPEZ exit the van.  I recognized LOPEZ from his Registry of Motor Vehicle photograph.  Shortly thereafter, agents saw the CW leave the area in the CW's car and followed him/her back to the

9

meeting location where he/she gave me a Smith and Wesson nine millimeter handgun.[3]

19.   In my presence, at approximately 4 p.m. on December 15, the CW received an incoming, consensually recorded call from LOPEZ in which LOPEZ told the CW to meet him at the corner of Haverhill and Ames Streets (i.e., the Target Premises), which LOPEZ described as his home and his mother's home.  Under surveillance, and wearing a recording device, the CW arrived at Ames and Haverhill Streets in Lawrence at approximately 4:21 p.m. on December 15, 2003.  On the transmitter, I heard the CW get out of the car, enter a building, and meet with LOPEZ.  Law enforcement officers later saw the CW come out of the side door on the Ames Street side of the Target Premises.  The CW later told me that he/she entered the Target Premises, which he described as a floor through apartment LOPEZ shares with his mother, with LOPEZ's bedroom near the Ames Street, side door entrance.

20.   I have reviewed the audiotape of the December 15, 2003, meeting between LOPEZ and the CW at the Target Premises and recognized the voice of LOPEZ on the tape.  When the CW got to the Target Premises the CW and LOPEZ went into LOPEZ's bedroom

---

[3] ATF records indicate that the firearm bearing the serial number of the Smith & Wesson nine millimeter the CW handed me (i.e., A412638), was part of a multi-firearm sale in New Hampshire in 2001.

and LOPEZ told the CW that he (LOPEZ) had some hollow points for the gun that they could get from "RONNIE" on Howard Street later that night. The CW gave LOPEZ the $1,700 in OGF and LOPEZ pulled what appeared to the CW to be three ounces of cocaine from what the CW described as a "Saint Louis" jersey, showed it to the CW, and said that he (LOPEZ) sells both cocaine and heroin. LOPEZ told the CW that he got the three ounces from a kilogram of cocaine and quoted the CW various prices for different amounts of cocaine. LOPEZ subsequently called his supplier and told the CW it would be five minutes. A short time later, LOPEZ left the room and returned with two "fingers" (approximately twenty grams) of heroin and gave it to the CW in exchange for the $1,700 in OGF.

21. After giving LOPEZ a ride, under surveillance, to and from a market on Haverhill Street, the CW was followed back to a nearby location where, he/she handed me, two "fingers" of heroin packaged in a pink wax substance (packaging similar to that in previous heroin sales to the CW by DELGADO). The substance the CW handed me field tested positive for heroin and has been sent to the DEA laboratory for further testing.

## THE PURCHASE OF 13 GRAMS OF COCAINE AND
## 3 GRAMS OF MARIJUANA ON DECEMBER 17, 2003

22. On December 17, 2003, I met with the CW who told me that he/she had received a call from LOPEZ who told the CW that "they" had done a home invasion and gotten 240 grams of heroin, and that LOPEZ had twenty grams to sell to the CW for $1,200. At approximately 7:11 p.m. on December 17, 2003, the CW made a consensually recorded call to 978-397-2180, LOPEZ's cellular telephone, and LOPEZ told the CW to meet LOPEZ at DELGADO's house.

23. At approximately 7:20 p.m., agents set up surveillance at 30 May Street in Lawrence, i.e., DELGADO's residence. The CW, while wearing a recording device, was followed to 30 May Street and agents saw the CW go into 30 May Street while, on the transmitter, I overheard him/her meeting with LOPEZ and DELGADO. The CW stated that LOPEZ was sitting on a couch holding a bag containing what appeared to be five to six ounces of cocaine and LOPEZ put the bag on the couch and then threw the CW a small bag of cocaine, explaining to the CW that it was better than the cocaine LOPEZ had shown the CW at LOPEZ's house the other day. The CW then gave LOPEZ $600 in OGF for the cocaine.

24. The CW asked LOPEZ how much cocaine he had in the bag and LOPEZ said that he had 130 grams in the bag and that he was going to sell it to a kid for $3,000. The CW asked LOPEZ about getting some heroin and LOPEZ told the CW to talk to DELGADO.

12

The CW then asked DELGADO for some heroin and DELGADO said he had some earlier but had moved it to another location and they would have to go get it. The CW then talked more with LOPEZ, who said that he and DELGADO sold the same heroin but had their own customers.[4] LOPEZ also said that his cousin was selling LOPEZ a .45 semi-automatic pistol and explained that he (LOPEZ) was adding to his collection of guns.

24. After an unknown male entered the apartment, the CW asked DELGADO if DELGADO's girlfriend, MARISOL ROQUE (A/K/A "CHINA"), had any marijuana for sale. CHINA overheard and said that she did. At the CW's request, CHINA provided the CW with two ten dollar bags of marijuana in exchange for twenty dollars.

25. The CW, DELGADO and the unknown male then drove, under surveillance, to a location on High Street in Lawrence to get the heroin for the CW. The CW gave DELGADO $1,200 in OGF and DELGADO gave it to the unknown male who got out of the car and never returned. DELGADO later told the CW that they had been burned.

26. Under surveillance, the CW and DELGADO returned to 30 May Street and then the CW was followed back to a nearby

---

[4] During a controlled heroin buy from DELGADO at 30 may Street, Apt 2, in Lawrence, on December 4, 2003, LOPEZ told the CW that LOPEZ sells heroin in gram quantities because there was too much risk in selling heroin in smaller quantities. LOPEZ also stated that he buys his heroin from a source in New York and that he has special belt to carry eggs of heroin. During that conversation, LOPEZ also told the CW about commercial robberies LOPEZ had done in which he stole television sets.

location, where he/she gave me a plastic bag containing cocaine and two bags of marijuana.  The substances the CW handed me field tested positive, respectively, for cocaine and marijuana.  The DEA laboratory later certified that the substances contained, respectively, 13.3 grams of cocaine hydrochloride, a Schedule II controlled substance, and 3.1 grams of marijuana.

### ADDITIONAL INFORMATION

27.  On December 30, 2003, I met with the CW and the CW said that DELGADO had called the CW and asked the CW to return DELGADO's .357 magnum.  The CW told DELGADO that he/she had lost the gun.  DELGADO asked the CW if the CW had given the gun to the police, and then said that he and LOPEZ needed to speak with the CW, that there was a rumor on the street that the CW was working for the police, and demanded that the CW come to DELGADO's house. The CW, at my instruction, refused.

28.  At approximately 9:38 p.m. on December 30, 2003, the CW made a consensually recorded call to LOPEZ at 978-397-2180, the cellular phone of LOPEZ.  The CW told LOPEZ what DELGADO had said and LOPEZ reassured the CW that LOPEZ had no problem doing business with the CW.[5]

---

[5] Although LOPEZ has recently told the CW that he has moved to Providence, R.I., cell site information for LOPEZ's cellular phone has indicated that LOPEZ remains in the Lawrence, MA, area.

14

## OTHER EVIDENCE OF LOPEZ'S USE OF THE TARGET PREMISES

29.  Throughout the course of this case, agents have conducted additional investigation indicating that LOPEZ has resided at the Target Premises, his mother's home, throughout the course of the investigation.  This aspect of the investigation has revealed the following.

A.  On 1-7-2004, a Massachusetts Driver's license query indicated that EDDY LOPEZ has an active Massachusetts Driver's license #030583771, which lists his mailing address as 594 Haverhill Street, Floor 1, Lawrence, MA.

B.  Records obtained on 1-13-2004 from Choice Point online, a commercial database, indicated that "EDDIE" LOPEZ used 594 Haverhill Street, Lawrence, MA, when applying for credit in August, 2002.

C.  Electric subscriber records obtained from National Grid Electric on 1/13/04 for 594 Haverhill Street, Floor 1, Lawrence, MA, indicated that the electric service at the residence has been subscribed to by the mother of EDDY LOPEZ, NEIDA TORRES, A/K/A NEIDA LOPEZ, off and on from November 1998 through November 2003.

--------

30.  Based on the forgoing, I believe there is probable cause to believe that EDDY LOPEZ is engaged in the ongoing business of selling drugs and guns out of the Target Premises. On December 15, 2003, LOPEZ negotiated and arranged the sale of a Smith and Wesson nine millimeter handgun and heroin to the CW. The sale of the heroin took place at the Target Premises and the CW paid LOPEZ the $1,700 in OGF at the Target Premises.  During that meeting at the Target Premises, LOPEZ showed the CW what

appeared to be three ounces of cocaine, which he said came from a kilogram of cocaine, and told the CW that he (LOPEZ) deals in both cocaine and heroin.

31. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for individuals who distribute controlled substances to maintain in their residences drugs, drug paraphernalia and records relating to their drug trafficking activities.

32. Because individuals who distribute controlled substances in many instances will "front" (that is, sell on consignment) drugs to their clients, or alternatively, will be "fronted" drugs from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often individuals who distribute controlled substances keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") by the trafficker's suppliers and the trafficker's dealers.  Additionally, individuals who distribute controlled substances must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

16

33. Based upon my training and experience, I am also aware that it is a common practice for distributors of controlled substances to conceal at their residences sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances such as the $1,700 in serialized funds that were paid to LOPEZ for heroin at the Target Premises on December 15, 2003. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug distribution would also typically be maintained in residences.

34. Individuals who distribute controlled substances and firearms often stay in contact with their customers and suppliers using cellular telephone equipment. Bills and other documents relating to the usage of such equipment and the information which is frequently stored within it (such as telephone listings of clients and suppliers, speed dialing features and voice mail) are also likely to be present in a trafficker's residence and will confirm prior contacts with suppliers and customers. Here, that equipment is likely to be anywhere inside the Target Premises.

35. During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or

17

ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Firearms have also been recovered during some of those searches. I am aware that drug traffickers frequently possess and use firearms to protect their illegal drug businesses.

36. My awareness of these trafficking practices, arise from my own involvement in prior drug investigations and searches during my career as a law enforcement officer, my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior investigations, as well as what other law enforcement agents and officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, and other information provided through law enforcement channels.

## ITEMS TO BE SEIZED

37. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth above, I submit that there is probable cause to believe that evidence regarding illegal drug activities will be found in the Target Premises. More specifically, I

18

submit that there is probable cause to believe that the following items of evidence will be found in the subject premises:

1.  Cocaine and heroin.

2.  Paraphernalia for the packaging, processing and distribution of controlled substances such as heroin, to include packaging materials (such as the pink wax and rubber like materials used to package the heroin in this case), plastic bags and seals, scales, "cutting" agents used to dilute/extend heroin prior to sale, and electronic pagers and cellular telephones used to communicate with drug associates.

3.  Books, records, notes, ledgers, and any other papers or records relating to the purchase or distribution of heroin and/or firearms, and/or records or electronic devices reflecting the identity of co-conspirators and drug and/or firearm customers, as well as their addresses, telephone, and pager numbers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, bank records, money orders, wire transfers, cashier's checks, passbooks, certificates of deposit, bills, vehicle rental receipts, credit card receipts, and/or telephone bills.

4.  Cash and currency, and other items of value made or derived from trafficking in illegal substances or documents related thereto. Such items include, but are not limited to jewelry, titles, deeds, registrations, purchase or sale invoices, bank records, or any other papers concerning financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in illegal substances.

5.  Documents reflecting dominion and/or control of 594 Haverhill Street, Floor 1, Lawrence, MA, including, but not limited to, canceled mail, photographs, personal telephone books, diaries, bills and statements, videotapes, keys, identification cards and documents, airline tickets and related travel documents, bank books, checks, and check registers.

19

6.   Documents or tangible evidence reflecting dominion, ownership, and/or control by EDDY LOPEZ over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

7.   Photographs of individuals, property, and/or illegal controlled substances.

8.   Firearms, including ammunition, magazines, holsters, and any components of firearms.

**CONCLUSION**

38.   Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that on December 15, 2003, EDDY LOPEZ, A/K/A "SWIFT", after having been previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess in and affecting commerce, a firearm, to wit:  a Smith and Wesson nine millimeter handgun, bearing serial number A412638, in violation of 18 U.S.C. §922(g)(1).  Based on the foregoing, I further believe there is probable cause to believe that on December 15, 2003, EDDY LOPEZ, A/K/A "SWIFT", did possess with intent to distribute and distribute heroin, a Schedule I substance, and that, on December 17, 2003, EDDY LOPEZ, A/K/A "SWIFT", did possess with intent to distribute and distribute cocaine, a Schedule II substance, in violation of 21 U.S.C. § 841 (a)(1).

39. Based upon the foregoing, and based upon my training and experience, I also submit that there is probable cause to believe that the premises located at 594 Haverhill Street, Floor 1, Lawrence, Massachusetts, which are more specifically described above, presently contain the items set forth above, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, violations of 21 U.S.C. §§ 841(a)(1) and 922(g)(1). Accordingly, I respectfully request that a search warrant be issued for the seizure of these items in the Target Premises.

JEFFREY E. WOOD, JR.
Special Agent, FBI

Subscribed and sworn to
before me, this 19 day
of January, 2004

ROBERT B. COLLINGS
United States Magistrate Judge

21